**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| VALENTINA V. TISH, | ) | |
|       Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **2:06-cv-820** |
| | ) | |
| MAGEE-WOMEN'S HOSPITAL OF | ) | |
| THE UNIVERSITY OF PITTSBURGH | ) | |
| MEDICAL CENTER, | ) | |
| | ) | |
|       Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

Before the Court for disposition are the Defendant's MOTION FOR SUMMARY JUDGMENT (*Document No. 29*), the Defendant's Brief in Support of Motion for Summary Judgment (*Document No. 30*), the Defendant's Concise Statement of Material Facts in Support of Motion for Summary Judgment (*Document No. 31*), the Defendant's Appendix of Documents in Support of Motion for Summary Judgment (*Document No. 32*), the Plaintiff's Brief in Opposition to the Defendant's Motion for Summary Judgment (*Document No. 35*), the Plaintiff's Response to the Defendant's Concise Statement of Material Facts (*Document No. 37*), and the Defendant's Reply Brief in Support of Motion for Summary Judgment (*Document No. 39*). For the reasons that follow, the Defendant's motion for summary judgment will be denied.

## Background

Plaintiff Valentina V. Tish ("Tish") was employed as a medical assistant for Womancare Associates at Defendant Magee-Women's Hospital of the University of Pittsburgh Medical Center ("Magee") from January 2004 through August 28, 2004.[1] Doc. Nos. 31 & 37, ¶ 2. On

---

[1] Tish, a native of Ukraine, recently completed the naturalization process and became a citizen of the United States. The record indicates that, as a part of the naturalization process, she petitioned the Court for permission to change her name. Doc. No. 37-2, p. 8. The petition was granted on December 21, 2007. *Id.* Her new name is Valentina V. Gladkov. *Id.* In her brief, Tish indicates that she is in the process of amending the caption in this case to reflect her name change. As of today, however, she has not filed a motion to amend the caption. Consequently,

1

February 28, 2004, she was injured in a skiing accident. *Id.*, ¶ 5. The accident caused a tear in the anterior cruciate ligament ("ACL") of her right knee. *Id.*, ¶ 8. Under the Family and Medical Leave Act of 1993 ("FMLA") [29 U.S.C. § 2601 *et seq.*], an eligible employee is "entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). On March 5, 2004, Dr. Freddie Fu certified Tish's need for medical leave in accordance with 29 U.S.C. § 2613. Doc. No. 32-2, p. 15. The certification form indicated that Tish's medical condition had commenced on February 28, 2004, and that its probable duration was unknown. *Id.* Tish formally applied for FMLA leave on March 5, 2004. *Id.*, p. 17.

In a letter dated March 10, 2004, Human Resources Representative Holly Novak ("Novak") informed Tish of her rights under both the FMLA and Magee's internal policies. Doc. No. 32-2, p. 21. The letter stated, in pertinent part, as follows:

> This letter serves to inform you of your rights under the Family and Medical Leave Act of 1993, as well as specific procedures set forth in Human Resources Policy # 40, <u>Leave of Absence</u>.
>
> • A Leave of Absence is defined as time off with or without pay and may not exceed six months in any 12-month period.
>
> • An employee's position will be held for twelve weeks within a twelve-month period while the employee is on leave.
>
> Your absence began on February 28, 2004 and your job hold will exhaust on May 23, 2004. If you become available beyond that date, Magee will make every effort to identify an available position that you may be qualified to perform.

*Id.* On June 2, 2004, Novak sent Tish a letter stating that her FMLA leave had been exhausted as of May 23, 2004. *Id.*, p. 23. At that time, Tish was unable to return to work. Doc. Nos. 31 & 37, ¶ 24. In accordance with Magee's internal policy, Tish was given additional leave time, giving her a total of six months of leave (including the exhausted FMLA leave). *Id.*, ¶ 25. During Tish's leave, her duties were performed by other employees. *Id.*, ¶ 26.

---

the Court will continue to refer to her as Tish.

In a letter dated August 27, 2004, Novak informed Tish that her employment with Magee would be terminated on August 28, 2004, because her medical leave was about to exceed the maximum of six months permitted under Magee's policy. Doc. No. 32-2, p. 35. Dr. Irina Vinarski, Tish's primary care physician, cleared Tish to return to work as of August 30, 2004. *Id.*, p. 19. Nevertheless, Dr. Vinarski indicated that Tish would need special accommodations because of her knee injury. *Id.*

A related case, *Bolden v. Magee Women's Hospital of the University of Pittsburgh Medical Center*, Civil Action No. 05-1063 (the "Bolden Action"), was commenced by Carole Bolden ("Bolden") against Magee on August 1, 2005. Bolden sought redress under the Americans with Disabilities Act of 1990 ("ADA") [42 U.S.C. § 12101 *et seq.*]. On May 30, 2006, Bolden filed a motion for leave to file amended complaint, seeking to add Tish as a plaintiff in the Bolden Action. This Court denied the motion for leave to file amended complaint on June 13, 2006.

On June 21, 2006, Tish commenced this action against Magee, alleging that Magee had violated the Rehabilitation Act of 1973 ("Rehabilitation Act") [29 U.S.C. § 701 *et seq.*]. Doc. No. 1. Tish also asserted class allegations under both the ADA and the Rehabilitation Act. On August 11, 2006, at a status conference in the Bolden Action, the Court permitted Bolden to renew her request to amend her complaint for the purpose of adding class action allegations. Nevertheless, this request was denied on October 5, 2006. Bolden had exhausted her administrative remedies before the Equal Employment Opportunity Commission ("EEOC") pursuant to 42 U.S.C. §§ 2000e-5 and 12117(a), but she had not exhausted the administrative prerequisites for a class action.

Magee filed a motion to dismiss Tish's ADA claims on July 26, 2006, relying on Federal Rule of Civil Procedure 12(b)(6). Doc. No. 3. On August 15, 2006, Tish filed a motion for joinder pursuant to Federal Rule of Civil Procedure 20, seeking to join this action with the Bolden Action. Doc. No. 8. The Court disposed of both motions on October 17, 2006. Doc. No. 10. The motion for joinder was denied, and the motion to dismiss was granted. *Id.* Since Tish had not exhausted her administrative remedies before the EEOC, her ADA claims were dismissed. *Id.*, p. 2.

Tish filed an amended complaint in class action on October 25, 2006, purporting to add Gary Chedwick ("Chedwick"), Barbara Fowler ("Fowler"), Gloria Hamlett ("Hamlett") and Terri Walsh ("Walsh") as plaintiffs and UPMC St. Margaret, UPMC Shadyside, UPMC Montefiore, and UPMC d/b/a University of Pittsburgh Medical Center ("UPMC") as defendants. Doc. No. 11. This amended complaint was filed without leave of court. The amended complaint alleged violations of both the ADA and the Rehabilitation Act. *Id.* It was averred that Hamlett and Walsh had exhausted their administrative remedies before the EEOC, and that they had received right to sue letters. *Id.*, p. 2, ¶ 4. On November 8, 2006, the UPMC entities filed a motion to strike the amended complaint, arguing that they would be prejudiced if they had to defend all of the related claims in a single action. Doc. No. 13. They also filed an alternative motion to sever pursuant to Federal Rule of Civil Procedure 21. *Id.*

Magee moved for summary judgment in the Bolden Action on November 13, 2006. On April 24, 2007, the Court issued decisions in both the Bolden Action and this action. Magee was granted summary judgment in the Bolden Action.[2] *Bolden v. Magee Women's Hospital*, 2007 WL 1228479, 2007 U.S. Dist. LEXIS 30127 (W.D.Pa. April 24, 2007). The Court treated Tish's filing of the amended complaint without leave of court as a request for leave to amend, granting the request. *Tish v. Magee-Women's Hospital*, 2007 WL 1221137, at *6-7, 2007 U.S. Dist. LEXIS 30130, at *15-20 (W.D.Pa. April 24, 2007). In granting Tish's implied request for leave to amend, the Court accommodated the UPMC entities' concerns about prejudice by granting their alternative motion to sever. *Tish*, 2007 WL 1221137, at *7, 2007 U.S. Dist. LEXIS 30130, at *18-20. Therefore, Tish is the only plaintiff in this action. Since she has not exhausted her administrative remedies, she can proceed only under the Rehabilitation Act.[3]

---

[2]On June 4, 2008, the United States Court of Appeals for the Third Circuit affirmed this Court's decision to grant summary judgment in favor of Magee in the Bolden Action. *Bolden v. Magee Women's Hospital*, 281 Fed.Appx. 88 (3d Cir. 2008).

[3]The ADA is Commerce Clause legislation which prohibits disability-based discrimination by entities engaged in industries affecting commerce. 42 U.S.C. § 12111(5)(A). Section 794 of the Rehabilitation Act is Spending Clause legislation which prohibits disability-based discrimination by certain recipients of federal financial assistance. 29 U.S.C. § 794(b). Where an entity covered under both statutes engages in illegal disability-based discrimination, it violates both the ADA and the Rehabilitation Act. Nevertheless, Tish cannot proceed under the ADA because she has not exhausted her administrative remedies before the EEOC.

Magee filed a motion for summary judgment on June 16, 2008. That motion is the subject of this memorandum opinion.

**Standard of Review**

Rule 56(c) of the Federal Rules of Civil Procedure reads, in pertinent part, as follows:

> [Summary Judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

In interpreting Rule 56(c), the United States Supreme Court has stated:

> The plain language . . . mandates entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).

An issue of material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must view the facts in the light most favorable to the non-moving party, and the burden of establishing that no genuine issue of material fact exists rests with the movant. *Celotex*, 477 U.S. at 323. The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against the moving party." *Ely v. Hall's Motor Transit Co.*, 590 F.2d 62, 66 (3d Cir. 1978) (*quoting Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972)). Final credibility determinations on material issues cannot be made in the context of a motion for summary judgment, nor can the district court weigh the evidence. *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632 (3d Cir. 1993); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' -- that is, pointing out to the District Court -- that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325. If the moving party has carried this burden, the burden shifts to the non-moving party, who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Petruzzi's IGA Supermarkets*, 998 F.2d at 1230. When the non-moving party's evidence in opposition to a properly supported motion for summary judgment is "merely colorable" or "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249-250.

## Discussion

Tish's claims against Magee arise under § 504 of the Rehabilitation Act, the present version of which is codified at 29 U.S.C. § 794(a). The relevant statutory language provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). It is undisputed that Magee's operations constitute a "program or activity" within the meaning of the Rehabilitation Act. 29 U.S.C. § 794(b). The plain language of the Rehabilitation Act makes the "remedies, procedures and rights" set forth in Title VI of the Civil Rights Act of 1964 ("Title VI") [42 U.S.C. § 2000d *et seq.*] available to those whose rights under § 794(a) are violated. 29 U.S.C. § 794a(a)(2). Title VI provides for the termination of a covered entity's federal funding if that entity engages in prohibited forms of discrimination based on race, color or national origin. 42 U.S.C. § 2000d-1. Although Title VI contains no express private right of action, the United States Supreme Court has construed it to contain an implied private right of action, which has been acknowledged by Congress in subsequent statutory amendments. *Barnes v. Gorman*, 536 U.S. 181, 185 (2002). Since Congress has incorporated Title VI's remedial scheme into the Rehabilitation Act, individuals have a private right of action under § 794(a). *Three Rivers Center for Independent Living, Inc. v.*

*Housing Authority of Pittsburgh*, 382 F.3d 412, 425-426 (3d Cir. 2004). Therefore, Tish can maintain this action against Magee for alleged violations of § 794(a).

The Rehabilitation Act defines the term "individual with a disability" as "any person who . . . (I) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment." 29 U.S.C. § 705(20)(B). The parties dispute whether Tish qualified as an "individual with a disability" during the period of time in question. The claims asserted by Tish in this case center on a theory of employment discrimination. Shortly after Title I of the ADA went into effect, Congress amended § 794(a) of the Rehabilitation Act to incorporate the standards applicable under Title I for the purpose of determining whether a covered entity has violated § 794(a).[4] Pub. L. No. 102-569, § 506, 106 Stat. 4344, 4428 (1992). For this reason, the standards applicable under § 794(a) are coextensive with those applicable under Title I. 29 U.S.C. § 794(d).

At the outset, the Court notes that Congress recently amended the ADA's definition of the term "qualified individual with a disability" as a part of the ADA Amendments Act of 2008. Pub. L. No. 110-325, § 4, 122 Stat. 3553 (2008). The new standard for determining the existence of a disability will also apply to cases under the Rehabilitation Act. *Id.*, § 7. This legislation was signed into law by President George W. Bush on September 25, 2008. Nevertheless, it does not go into effect until January 1, 2009.[5] *Id.*, § 8. By enacting this legislation, Congress has clearly expressed its intent to repudiate the Supreme Court's decisions in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), and *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534

---

[4]President George H.W. Bush signed the ADA into law on July 26, 1990, but Title I did not become effective until July 26, 1992. Pub. L. No. 101-336, § 108, 104 Stat. 327, 337 (1990). The legislation incorporating Title I's standards into § 794(a) of the Rehabilitation Act was signed into law on October 29, 1992. Pub. L. No. 102-569, § 506, 106 Stat. 4344, 4428 (1992).

[5]Although the Court does not decide the issue of retroactivity, it is doubtful that the new amendments would be applicable to this case even if they had gone into effect immediately. The alleged discrimination at issue in this case occurred before the enactment of the amendments, and there is nothing in the statutory language which suggests that these amendments should be applied retroactively. Pub. L. No. 110-325, 122 Stat. 3553 (2008). Therefore, the general presumption that legislation is to be applied only prospectively would most likely defeat any argument to the effect that the new amendments could be applied in this case. *Ward v. Allied Van Lines, Inc.*, 231 F.3d 135, 141-142 (4th Cir. 2000). The Court need not reach that issue, however, since the amendments have not yet taken effect in any event.

U.S. 184 (2002), and to expand the class of individuals who are entitled to protection under the ADA and the Rehabilitation Act.  *Id.*, § 2.  While *Sutton* and *Toyota Motor Manufacturing* will no longer be applicable to claims arising under the ADA and the Rehabilitation Act upon the arrival of the new year, they do govern the legal obligations of Magee in this case.  Accordingly, the Court will evaluate Tish's claims in accordance with those decisions.

Since the standards applicable under § 794(a) of the Rehabilitation Act are coextensive with those applicable under Title I of the ADA, the Court turns to the ADA for the purpose of determining whether Tish can establish a violation of the Rehabilitation Act.  Title I's anti-discrimination provision, which is codified at 42 U.S.C. § 12112(a), provides:

> **§ 12112.  Discrimination**
> **(a) General rule.**  No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).  Critical to the Court's analysis is the ADA's rule of construction concerning the term "discriminate," which provides, in pertinent part, as follows:

> **(b) Construction.**  As used in subsection (a), the term "discriminate" includes--
>
> ***
> (5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or
> (B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant[.]

42 U.S.C. § 12112(b)(5).  The ADA also defines the term "reasonable accommodation."  The applicable definition provides:

> (9) Reasonable accommodation.  The term "reasonable accommodation" may include--
> (A) making existing facilities used by employees readily accessible to and usable

by individuals with disabilities; and
(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9). Since 29 U.S.C. § 794(d) incorporates § 12112(a)'s use of the term "discriminate" into the Rehabilitation Act, the ADA's definitions are controlling in this case.

In order to establish a *prima facie* "failure to accommodate" case under the Rehabilitation Act, Tish must establish that: (1) she had a disability; (2) Magee had notice of her disability; (3) she was able to perform the "essential functions"[6] of her job with a reasonable accommodation; and (4) Magee failed to provide a reasonable accommodation. *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387, n. 11 (4th Cir. 2001). The ADA does not specifically refer to an "interactive process." By its own terms, the ADA "requires only that an employer make a reasonable accommodation to the known physical or mental disability of a qualified individual with a disability unless the employer can show that the accommodation would impose an undue hardship on the employer." *Conneen v. MBNA America Bank, N.A.*, 334 F.3d 318, 329 (3d Cir. 2003). Nonetheless, 29 C.F.R. § 1630.2(o)(3) provides:

To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3). In order to hold Magee responsible for a breakdown in the interactive process, Tish must show that: (1) Magee was aware of her disability; (2) she requested reasonable accommodations for her disability; (3) Magee did not make a good faith effort to

---

[6]The Court's use of the term "essential functions" is grounded in the ADA, which defines the term "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The statutory language further provides that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Id.*

assist her in obtaining reasonable accommodations; and (4) she could have been reasonably accommodated but for Magee's lack of good faith. *Conneen*, 334 F.3d at 330-331.

It is undisputed that Tish's ACL tear constitutes a "physical impairment" within the meaning of the ADA and the Rehabilitation Act. Magee contends, however, that this *impairment* was not severe enough to constitute a *disability*. In order to establish that she was "disabled," Tish must show that her physical impairment *substantially* limited one or more of her *major life activities*. The EEOC has promulgated regulations concerning this inquiry.[7] The applicable regulations provide:

> (I) *Major Life Activities* means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.
>
> (j) *Substantially limits*–(1) The term *substantially limits* means:
>> (I) Unable to perform a major life activity that the average person in the general population can perform; or
>> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.
>
> (2) The following factors should be considered in determining whether an individual is substantially limited in a major life activity:
>> (I) The nature and severity of the impairment;
>> (ii) The duration or expected duration of the impairment; and
>> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(i)-(j). The list of "major life activities" appearing in the regulations is illustrative rather than exhaustive.[8] *Bragdon v. Abbott*, 524 U.S. 624, 639 (1998). Consequently,

---

[7]The Supreme Court has assumed *arguendo* that the EEOC's regulations interpreting the term "disability" in the ADA are valid, even though the ADA does not expressly give the EEOC the authority to issue such regulations. *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 194 (2002); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 479-480 (1999). The parties in this case do not question the validity of the regulations, so the Court has no occasion to consider whether the EEOC exceeded its authority in promulgating them. *Williams v. Philadelphia Housing Authority Police Department*, 380 F.3d 751, 762, n. 7 (3d Cir. 2004).

[8]The list of "major life activities" appearing in the EEOC's regulations corresponds directly with the list appearing in the regulations promulgated under the Rehabilitation Act. 45 C.F.R. § 84.3(j)(2)(ii); 28 C.F.R. § 41.31(b)(2). The ADA contains a rule of construction providing that, except as otherwise provided, nothing in the ADA shall be construed to "apply a lesser standard" than the standards applicable under Title V of the Rehabilitation Act or the regulations promulgated by federal agencies pursuant thereto. 42 U.S.C. § 12201(a).

Tish can establish the existence of a disability by showing that she was substantially limited in any major life activity, including one which is not enumerated in the regulations.

Tish contends that, at the time of the alleged discrimination, she was substantially limited in the major life activities of walking, standing, bending and lifting. Doc. No. 35, p. 2. It is not clear whether the activity of "bending" constitutes a "major life activity" within the meaning of the ADA and the Rehabilitation Act.[9] *Parkinson v. Anne Arundel Medical Center, Inc.*, 214 F.Supp.2d 511, 515 (D.Md. 2002). Some courts have proceeded on the assumption that bending is a major life activity. *Whitfield v. Pathmark Stores, Inc.*, 39 F.Supp.2d 434, 440 (D.Del. 1999). Magee appears to question the correctness of this assumption. Doc. No. 30, p. 11. The Court need not resolve this question, however, because Tish has produced sufficient evidence that she was substantially limited in other major life activities to defeat Magee's motion for summary judgment. *Wilson v. Lemington Home for the Aged*, 159 F.Supp.2d 186, 199, n. 4 (W.D.Pa. 2001).

The record indicates that Tish's right knee was injured in a skiing accident on February 28, 2004. Tish went to the emergency room at Frick Hospital in Mt. Pleasant, Pennsylvania. Doc. No. 32, p. 27. Vicodin was prescribed to alleviate her pain. *Id.* On March 1, 2004, Tish was examined by Dr. Tanya J. Hagen. Dr. Hagen reported that Tish had been "unable to bear full weight" on her knee while walking. *Id.*, p. 31. Concerned that Tish may have suffered a torn ACL, Dr. Hagen referred Tish for a magnetic resonance imaging ("MRI") scan. *Id.*, pp. 31-32. The MRI scan yielded the following findings:

> There is an ACL tear. There are corresponding bony contusions of the medial and lateral posterior tibia and lateral femur. An effusion is seen. The menisci are within normal limits. The collateral ligaments are within normal limits. The extensor mechanism is within normal limits.

*Id.*, p. 34. Tish followed up with her primary care physician, Dr. Vinarski, who indicated that she had sustained a "complete ACL tear." *Id.*, p. 38.

---

[9]This uncertainty will be short-lived. As of January 1, 2009, "bending" will definitely be a "major life activity" within the meaning of the ADA and the Rehabilitation Act. The ADA Amendments Act of 2008 expressly provides that "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." Pub. L. No. 110-325, § 4, 122 Stat. 3553 (2008).

On March 5, 2004, Dr. Fu certified Tish's need for FMLA leave.  Doc. No. 32-2, p. 15. In the section of the certification form inquiring as to the probable duration of Tish's medical condition, Dr. Fu entered the words "not known."  *Id.*  Tish underwent surgery to repair her ACL on March 30, 2004.  Doc. No. 32, pp. 42-43.  Six weeks later, Tish saw Dr. Fu for a follow-up examination.  On May 10, 2004, Dr. Fu noted that Tish was "doing quite well," but that she continued to "have some discomfort at times."  Doc. No. 32-2, p. 2.  Tish's knee had "good range of motion," "minimal swelling," and "about 20% atrophy."  *Id.*  Tish was told that she could discontinue her use of crutches, but that she should continue to wear a brace and participate in aqua therapy.  *Id.*

Tish was examined by Dr. Fu again on June 7, 2004.  Doc. No. 32-2, p. 4.  The range of motion in her knee was from zero to 120 degrees.  *Id.*  Dr. Fu observed that Tish's knee had "very good stability" and "no swelling."  Nevertheless, he indicated that Tish's muscles were still weak.  *Id.*  Tish was instructed to continue with her aqua therapy.  *Id.*

Dr. Fu examined Tish again on August 9, 2004.  Doc. No. 32-2, p. 6.  Although Tish's knee had "good range of motion" and "no swelling," her muscles remained weak.  *Id.*  Dr. Fu made the following assessment at that time:

> I think she can go back to work, probably in September, as a medical assistant. She probably cannot do heavy lifting, bending or kneeling in the beginning.  She needs to continue therapy to make her muscles strong.  We will see her back in two months and determine how much further work she can do but initially she should not be on a very heavy lifting schedule.  We will help her with short term disability.

*Id.*  In a letter to Magee dated August 27, 2004, Dr. Vinarski stated as follows:

> Valentina underwent surgery on her Right Knee on 3-30-2004.  She was diagnosed with Right Knee Anterior Cruciate Ligament Tear.  Valentina is experiencing discomfort through out the day due to swelling and pain when too much pressure is put on knee.  In result she can only work part-time.

Doc. No. 37-5, p. 1.  Tish's employment with Magee was terminated on August 28, 2004, because she had been on leave for more than six months.  Doc. No. 32-2, p. 35.  On September 3, 2004, Dr. Vinarski certified Tish's ability to accept employment as of August 30, 2004.  *Id.*, p.

19. She noted that the expected duration of Tish's "disability, illness or injury" was "6-8 months." *Id.* Because Magee did not offer to accommodate Tish's work-related limitations, Pennsylvania's Bureau of Unemployment Compensation Benefits and Allowances determined that Tish's reason for leaving her job had been "necessitous and compelling," thereby entitling her to unemployment compensation benefits under Pennsylvania's Unemployment Compensation Law [43 PA. STAT. § 751 *et seq.*]. Doc. No. 32-2, p. 37.

Tish apparently enrolled in classes at Community College of Allegheny County ("CCAC") in September 2004. Doc. No. 37-2, p. 5, ¶ 15. She was examined by Dr. Fu on December 16, 2004. Dr. Fu observed that Tish continued to have "some pain with early changes," but that her knee was "very stable." Doc. No. 32-2, p. 8.

The record also contains documentary evidence of Tish's visits to Dr. Vinarski's office in 2006. On May 31, 2006, Tish underwent a physical examination required for enrollment in a nursing school. Doc. No. 32-2, pp. 10-11. On that occasion, Dr. Vinarski noted that Tish had "full joint motion" and "no deformities" in her extremities. *Id.*, p. 10. Tish returned to Dr. Vinarski's office on June 23, 2006. *Id.*, pp. 12-13. She went for this follow-up visit in order to receive vaccinations which she had not received during her earlier physical examination. *Id.*, p. 12. Dr. Vinarski's observations concerning Tish's extremities were unchanged from those made on May 31, 2006.

Tish has filed an affidavit describing the extent of her injuries. Doc. No. 37-2, pp. 1-7. In the affidavit, she states that she was unable to perform basic standing, walking and bending activities with her right knee. *Id.*, p. 2, ¶ 4. According to the affidavit, Tish was "substantially limited" in her ability to walk, stand, bend and lift from February 28, 2004, through the end of 2004. *Id.*, ¶ 5. She was unable to cook or clean for six months. *Id.* After the passage of six months, she was able to cook or clean only with both pain and a need for frequent breaks. *Id.* Tish asked her friends to do her grocery shopping for her, since she was unable to drive for a period of six weeks. *Id.*, p. 3, ¶ 9. Three months after her surgery, she struggled to walk up and down steps and to carry laundry or groceries. *Id.*, ¶ 10. Her leg swelled whenever she engaged in physical activities, making her unable to stand or walk for even a short period of time. *Id.* She needed to rest after standing or walking for only ten to fifteen minutes. *Id.*, p. 4, ¶ 10. Sitting on

a toilet was a struggle for her during that period of time. *Id.*

Tish's affidavit also describes her struggles after the passage of six months. She enrolled in classes at CCAC in September 2004. According to the affidavit, Tish had to use a bag with wheels to carry her books, since her injury precluded her from carrying them in a normal manner. Doc. No. 37-2, p. 5, ¶ 15. She needed to use an elevator in order to avoid walking up and down steps. *Id.* The breaks between her classes were not long enough for her to move from one classroom to another, causing her to be late in certain instances. *Id.* By December 2004, her condition had improved somewhat. *Id.*, ¶ 16. Nevertheless, she still had many limitations. *Id.* She could walk for only about twenty to thirty minutes without having to rest. *Id.* During the winter, she was afraid to walk on snow or slippery hills. *Id.* Although Tish was very active before her ACL injury, she continues to have difficulty standing and walking, particularly on steps. *Id.*, pp. 5-6, ¶ 17. Swimming is the only exercise that she remains able to engage in for the purpose of keeping her weight down and rehabilitating her leg. *Id.* The muscles in her right leg are atrophying. *Id.* Four years after her surgery, Tish was only able to stand or walk for about one hour before experiencing pain in her right knee. *Id.* When she stood for an hour in order to cook a meal, her knee would swell for two to three hours. *Id.* Because of her limitations, Tish attended sessions with Dr. Paul Friday, a clinical psychiatrist at Shadyside Hospital, as late as 2006. *Id.*, p. 6, ¶ 18. An evaluation conducted at UPMC Sports Medicine revealed that Tish continued to suffer from some injury-related limitations three years after the skiing accident, although her limitations were not as severe as they had been in 2004. *Id.*, ¶ 19.

In *Sutton*, the Supreme Court explained that "[a] disability exists only where an impairment substantially limits a major life activity, not where it might, could, or would be substantially limiting if mitigating measures were not taken." *Sutton*, 527 U.S. at 482. The plain language of the ADA requires that a disability determination be made "with respect to an individual." 42 U.S.C. § 12102(2). "Thus, whether a person has a disability under the ADA is an individualized inquiry." *Sutton*, 527 U.S. at 483. The Supreme Court has reasoned that Congress' intent was for the existence or nonexistence of a disability under the ADA to be determined in "a case-by-case manner." *Toyota Motor Manufacturing*, 534 U.S. at 198. In *Emory v. Astrazeneca Pharmaceuticals LP*, 401 F.3d 174, 182 (3d Cir. 2005), the United States

Court of Appeals for the Third Circuit explained that "even if two different plaintiffs alleging substantial limitations suffer from the same impairment, the nuances of its effect on their daily lives will invariably manifest themselves in distinct ways." Such differing manifestations sometimes result in different determinations as to the issue of disability under the ADA or the Rehabilitation Act. The Court is mindful of this general principle in evaluating Tish's limitations.

In *Bragdon v. Abbott*, 524 U.S. 624 (1998), the Supreme Court provided guidance concerning how a determination should be made as to whether a given impairment substantially limits one or more of a plaintiff's major life activities. In *Bragdon*, the Supreme Court held that a woman infected with human immunodeficiency virus ("HIV") could establish that she was "disabled" under the ADA by showing that the virus substantially limited her ability to reproduce. *Bragdon*, 524 U.S. at 640-642. Speaking through Justice Kennedy, the Supreme Court explained:

> The Act addresses substantial limitations on major life activities, not utter inabilities. Conception and childbirth are not impossible for an HIV victim but, without doubt, are dangerous to the public health. This meets the definition of a substantial limitation.

*Id.* at 641. It is clear that when significant limitations result from an impairment, the "disability definition" is met even if the difficulties caused by the impairment are not insurmountable. *Id.* This standard eschews reliance on the specific nature of particular impairments and embraces reliance on the limiting effects that such impairments have on an individual's major life activities. *Toyota Motor Manufacturing*, 534 U.S. at 198.

Like the ADA and the Rehabilitation Act, Tish's affidavit speaks of "substantial limitations on major life activities, not utter inabilities." *Bragdon*, 524 U.S. at 641. Having reviewed the evidence of record in detail, the Court is convinced that a genuine issue of material fact exists as to whether Tish was "disabled" at the time of the alleged discrimination. Three general principles guide the Court's analysis. First, whether Tish was "disabled" depends on whether she suffered from a physical or mental impairment that substantially limited one or more of her major life activities. 42 U.S.C. § 12102(2)(A). Second, "[t]he question of whether an

individual is substantially limited in a major life activity is a question of fact." *Williams v. Philadelphia Housing Authority*, 380 F.3d 751, 763 (3d Cir. 2004). Third, the evidence must be viewed in the light most favorable to Tish at this stage, since she is the non-moving party. *Kehm Oil Company v. Texaco, Inc.*, 537 F.3d 290, 293 (3d Cir. 2008). Viewed in this light, the evidence presented by Tish is sufficient to defeat Magee's motion for summary judgment.

Although no bright-line rule exists concerning the duration that an incapacitating impairment must have in order to constitute a disability, it is clear that "a temporary, non-chronic impairment of short duration is not a disability" under the ADA or the Rehabilitation Act.[10] *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002). It is beyond dispute that Tish was significantly limited in her ability to stand or walk immediately after her ACL tear. It is also undisputed that Tish's ability to stand or walk improved somewhat before the end of 2004. What the parties contest is whether Tish's impairment constituted a disability within the meaning of the ADA and the Rehabilitation Act. In *Williams v. Philadelphia Housing Authority*, 380 F.3d 751, 765 (3d Cir. 2004), the United States Court of Appeals for the Third Circuit explained that a plaintiff need not always establish the existence of a *permanent* disability in order to qualify for statutory protection. The actual or expected duration of an impairment, and the actual or expected permanent or long-term impact of an impairment, are merely factors to be considered in determining whether the impairment at issue constitutes a statutory disability. *Williams*, 380 F.3d at 765. They are not dispositive of the issue. The Court must also consider the nature and severity of Tish's impairment in determining whether she was within the class of persons entitled to protection under the Rehabilitation Act when the alleged discrimination occurred. *Id.* "[A]n impairment and its impact may be less than permanent and still 'significantly restrict' a person's ability" to engage in major life activities. *Id.* Where an impairment is both severe and long-term (i.e., expected to last for at least several months), it may constitute a disability. *Aldrich v. Boeing Company*, 146 F.3d 1265, 1269-1270 (10th Cir. 1998).

---

[10]The Court notes that the ADA Amendments Act of 2008 provides that "[a] transitory impairment is an impairment with an actual or expected duration of 6 months or less." Pub. L. No. 110-325, § 4, 122 Stat. 3553 (2008). This standard, of course, does not govern this case.

The determination of whether Tish was substantially limited in the major life activities of standing, walking and lifting turns on whether she was "significantly restricted as to the condition, manner or duration under which" she could perform such activities as compared to the condition, manner or duration under which "the average person in the general population" could perform those same activities. 29 C.F.R. § 1630.2(j)(1)(ii). The Court of Appeals has held that moderate difficulty walking or climbing stairs does not constitute a substantial limitation on the major life activity of walking. *Kelly v. Drexel University*, 94 F.3d 102, 107-108 (3d Cir. 1996). Moreover, an inability to walk for more than fifty minutes without a break has been found to be insufficiently limiting to bring an individual within the class of persons entitled to statutory protection under the ADA and the Rehabilitation Act. *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 183-187 (3d Cir. 1999). With respect to the major life activity of lifting, an inability to lift more than ten pounds has been deemed insufficiently limiting to render an individual substantially limited in the major life activity of lifting. *Marinelli v. City of Erie*, 216 F.3d 354, 363-364 (3d Cir. 2000).

In her affidavit, Tish states that she was unable to stand or walk for even a short period of time during the months immediately following the surgery to repair her ACL. Doc. No. 37-2, pp. 3-4, ¶ 10. At that point, she needed to rest after standing or walking for only ten to fifteen minutes. *Id.* Three months after the skiing accident and two months after the surgery, Tish was still unable to bear weight on her right leg. *Id.*, p. 4, ¶ 11. In September 2004, she was sometimes unable to arrive on time for her scheduled classes at CCAC because the breaks between classes were not long enough to enable her to walk from one building to another. *Id.*, p. 5, ¶ 15. She had to use a bag on wheels to carry her books because of her inability to lift or carry them in a more conventional manner. *Id.* By December 2004, Tish was still unable to walk for more than twenty to thirty minutes at a time. *Id.*, ¶ 16. She asserts that she still has difficulty standing and walking, and that the only exercise option reasonably available to her is swimming. *Id.*, pp. 5-6, ¶ 17. Her knee swells for two to three hours if she stands for an hour to cook a meal. *Id.*

When the evidence is viewed in the light most favorable to Tish, the relevant factors weigh in favor of a finding of a "disability" under the ADA and the Rehabilitation Act. For

several months, Tish was significantly restricted as to the "condition, manner or duration" under which she could stand or walk as compared to the "condition, manner or duration" under which "the average person in the general population" could stand or walk.[11] 29 C.F.R. § 1630.2(j)(1)(ii). The record indicates that she sustained a "complete ACL tear." Doc. No. 32, p. 38. An injury of that *nature* and *severity* no doubt had a significant impact on Tish's ability to stand or walk. At the time of the skiing accident, the probable *duration* of Tish's impairment was "not known." Doc. No. 32-2, p. 15. It was unclear exactly how long Tish would be significantly restricted in her ability to stand or walk. Moreover, the assertions made by Tish in her affidavit indicate that her ACL tear has had a long-term impact on her major life activities, even though she is currently not as limited as she was in 2004. When all of the relevant factors are considered in context, Tish appears to have been substantially limited in her ability to stand or walk for an extended period of time. There is, of course, some evidence which suggests that Tish's impairment may have been fully healed within two years. When Dr. Vinarski performed a physical examination of Tish on May 31, 2006, she indicated that Tish had "full joint motion" and "no deformities" in her extremities. Doc. No. 32-2, p. 10. Depending on how one construes Dr. Vinarski's treatment notes, these examination findings could be viewed as contradictory to some portions of Tish's affidavit. At this stage, however, the Court is not charged with the duty to resolve conflicts in the evidence. It suffices to say that a reasonable jury could conclude, on the basis of the evidence contained in the record, that Tish was substantially limited in her ability to stand or walk at the time of the alleged discrimination. The record is less clear with respect to the major life activity of lifting. Nevertheless, the Court need not concern itself with that issue, since Tish has presented sufficient evidence of the limitations on her standing and walking abilities to defeat Magee's motion for summary judgment.

Tish makes the alternative argument that she was "regarded as" disabled within the meaning of the Rehabilitation Act. Doc. No. 35, pp. 13-16. Magee contends that there is no

---

[11]In its brief, Magee relies on *Marinelli v. City of Erie*, 216 F.3d 354 (3d Cir. 2000), for the proposition that one's limitation to sedentary work does not constitute a "disability" under the ADA and the Rehabilitation Act. Doc. No. 30, pp. 16-17. The language in *Marinelli* relied upon by Magee concerned whether the plaintiff in that case was substantially limited in the major life activity of "working." *Marinelli*, 216 F.3d at 364-366. Since Tish does not contend that she was significantly limited in the major life activity of working, the language in *Marinelli* referenced by Magee is inapplicable to this case.

evidence that it regarded Tish as disabled, and that summary judgment is warranted. Doc. No. 30, pp. 17-19. The Court need not reach this issue, since it has already concluded that a genuine issue of material fact exists as to the question of actual disability. *Wilson*, 159 F.Supp.2d at 200, n. 6. Tish remains free, however, to pursue this alternative theory at trial.[12] As the Supreme Court explained in *Murphy v. United Parcel Service*, 527 U.S. 516, 521-522 (1999), "a person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities." This alternative basis for claiming statutory protection under the Rehabilitation Act remains available to Tish as the case proceeds to trial. The Court will not examine that issue at this time, since Magee's motion for summary judgment must be denied with respect to the question of actual disability.

Having determined (for the purpose of summary judgment) that Tish was within the class of persons entitled to protection under the Rehabilitation Act, the Court must now address the question of whether she can show that Magee's conduct constituted a violation of that statute. As noted earlier, the standards applicable under Title I of the ADA are applicable to Tish's Rehabilitation Act claims against Magee. 29 U.S.C. § 794(d). Under Title I, a covered entity engages in illicit "discrimination" when it fails to make "reasonable accommodations to the

---

[12]Magee argues that even if it had regarded Tish as disabled, it had no duty to accommodate her because she was not *actually* disabled. Doc. No. 30, pp. 19-20. This argument is foreclosed by the decision of the United States Court of Appeals for the Third Circuit in *Williams v. Philadelphia Housing Authority*, 380 F.3d 751, 772-776 (3d Cir. 2004). There is a circuit split on this issue. Under the governing precedents in four circuits, employees who are merely "regarded as" disabled are not entitled to reasonable accommodations under the ADA and the Rehabilitation Act. *Kaplan v. City of North Las Vegas*, 323 F.3d 1226, 1233 (9th Cir. 2003); *Weber v. Strippit, Inc.*, 186 F.3d 907, 916-917 (8th Cir. 1999); *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 467 (6th Cir. 1999); *Newberry v. East Texas State University*, 161 F.3d 276, 280 (5th Cir. 1998). In four other circuits, the governing precedents hold that employees who are "regarded as" disabled under the ADA and the Rehabilitation Act are entitled to reasonable accommodations. *D'Angelo v. Conagra Foods, Inc.*, 422 F.3d 1220, 1235-1236 (11th Cir. 2005); *Kelly v. Metallics West, Inc.*, 410 F.3d 670, 674-676 (10th Cir. 2005); *Williams*, 380 F.3d at 775; *Katz v. City Metal Co.*, 87 F.3d 26, 32-34 (1st Cir. 1996). Two courts of appeals have taken note of the circuit split while declining to decide the issue. *Wilson v. Phoenix Specialty Manufacturing Company*, 513 F.3d 378, 388 (4th Cir. 2008); *Cigan v. Chippewa Falls School District*, 388 F.3d 331, 335 (7th Cir. 2004). In *Gelfo v. Lockheed Martin Corporation*, 140 Cal.App. 4th 34, 55-62 (Cal.Ct.App. 2006), the Court of Appeals of California adopted the Third Circuit's analysis in *Williams* for the purpose of analyzing cases arising under California's Fair Employment and Housing Act. In its brief, Magee argues that the holding in *Williams* was erroneous. Doc. No. 30, p. 20. The Court notes that a writ of certiorari was sought, and denied, in *Williams*. *Philadelphia Housing Authority v. Williams*, 544 U.S. 961 (2005). Whether, and under what circumstances, the holding in *Williams* should be reconsidered is not for this Court to decide.

known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). Among the "reasonable accommodations" enumerated in the statutory language are "part-time or modified work schedules" and "reassignment to a vacant position." 42 U.S.C. § 12111(9)(B).

Since the Court has already concluded that Tish has produced sufficient evidence of a "disability" to defeat Magee's motion for summary judgment as to the question of whether she was within the class of persons entitled to statutory protection, the Court assumes *arguendo* that Tish was "disabled" at the time of the alleged discrimination. It is clear that Magee was aware of Tish's impairment, which was her reason for taking a six-month leave of absence immediately after her skiing accident.[13] In order to proceed with her claim, Tish must show that she was able to perform the "essential functions" of her job (or a potential alternative job) with a reasonable accommodation, and that Magee failed to provide her with such an accommodation. *Rhoads*, 257 F.3d at 387, n. 11. This examination requires the additional inquiry into whether Magee engaged in the interactive process for the purpose of ascertaining how Tish could be accommodated, and whether Tish could have been accommodated under the circumstances of this case. *Conneen*, 334 F.3d at 330-331.

The inquiry surrounding the "essential functions" of a given job is grounded in the statutory language of the ADA, which defines the term "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA further provides that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be

---

[13]If Tish seeks to establish at trial that she was "regarded as" disabled, she will have to do more than simply show that Magee knew that she was impaired. She will have to show that Magee believed her to be "disabled" under the ADA and the Rehabilitation Act. *Wilson v. MVM, Inc.*, 475 F.3d 166, 179 (3d Cir. 2007). The Court need not focus on that issue now because Tish has produced sufficient evidence of an actual disability to defeat Magee's motion for summary judgment.

considered evidence of the essential functions of the job." *Id.* By categorizing a "written description" provided by an employer as *evidence* of what the essential functions of a job are, Congress clearly did not intend for an employer's characterization of a job "requirement" as an "essential function" to be conclusive. While an employer is free to craft requirements for the positions that it creates, it is not free to avoid the strictures of the ADA or the Rehabilitation Act by simply characterizing all "requirements" as "essential functions." *Johnson v. McGraw-Hill Companies*, 451 F.Supp.2d 681, 704 (W.D.Pa. 2006).

The record includes the job description for Tish's medical assistant position at Magee. Doc. No. 32, p. 24. There are eight "essential functions" listed, none of which (at least on their faces) require the employee to stand or walk for significant periods of time.[14] Doc. No. 32, p. 24. Appearing under the heading "Special Skills and Abilities Required," *inter alia*, is the following language:

> Ability necessary for constant standing, walking, lifting and transporting patients and carrying supplies and equipment.

*Id.* It appears that Magee has characterized the ability to stand or walk for lengthy periods of time throughout the workday as a "requirement" of the position of medical assistant rather than as an "essential function" of that position.

Before the Court is an affidavit submitted by Kathleen Hayes ("Hayes"), who currently works as a Registered Nurse ("RN") for Womancare Associates at Magee. Doc. No. 32-2, pp. 27-28. In the affidavit, Hayes states that she was the Practice Manager for Womancare Associates when Tish was employed there as a medical assistant. *Id.*, p. 27, ¶ 2. Hayes further states that, in August 2004, she contacted Tish to determine whether Tish could return to work.

---

[14]The "essential functions" are listed in the job description as follows: (1) Provides direct patient care under the direction of a Registered Nurse or Physician; (2) Performs clerical functions including appointment scheduling, registration, insurance data, physician referrals, order entry, charge entry, coordination of patient medical record information, maintenance of records, logs and statistics; (3) Performs specimen collection, identification and processing in accordance with laboratory guidelines; Maintains required documentation; (4) Greets patients, answers the telephone, takes messages and communicates potential problem calls immediately to the registered nurse or physician; (5) Provides PTO coverage at designated practice sites as assigned; (6) Orders supplies for practice sites; (7) Maintains patient confidentiality; (8) Responsible for following the mandatory reporting procedures for any incident or serious event that did affect or potentially could have affected the clinical care of any patient. Doc. No. 32, p. 24.

*Id.*, p. 28, ¶ 10.  Tish allegedly informed Hayes that she could return to her position only if she could perform her duties on a sedentary basis.  *Id.*  According to Hayes, the duties of a medical assistant could not be performed on a sedentary basis, and no sedentary positions were available at that time.  *Id.*, ¶ 11.

It is clear from the record that Tish requested a part-time position.  On August 27, 2004, Dr. Vinarski opined that Tish was only capable of working on a part-time basis.  Doc. No. 37-5, p. 1.  In her affidavit, Tish states that she informed Magee of her limitation to part-time employment.  Doc. No. 37-2, p. 4, ¶¶ 12-14.  Consequently, the relevant question appears to be whether Magee could have transferred Tish to a part-time position rather than whether Tish was capable of performing her job as a medical assistant as she had before the skiing accident.  According to Tish, Novak told her that no part-time positions were available, and that she should pursue unemployment compensation benefits.  *Id.*, pp. 4-5, ¶ 14.  Novak allegedly made no inquiries concerning Tish's physical capabilities.  *Id.*

Prior to becoming a medical assistant for Womancare Associates, Tish worked as a medical assistant for an obstetrician/gynecologist.  Doc. No. 39-3, p. 39.  Her supervisor was Patricia Delserone ("Delserone").  Doc. No. 32-2, p. 32, ¶ 4.  On April 1, 2007, Delserone became the Practice Manager for the Gold Division of Womancare Associates.  *Id.*, ¶¶ 1-2.  In an affidavit, Delserone states that Tish has never contacted her to inquire about job opportunities since the date on which Tish left the obstetrician/gynecologist's practice.  *Id.*, p. 33, ¶ 5.  Even if accepted as true, however, Delserone's affidavit does not establish that Tish was somehow responsible for the breakdown in the interactive process.  The burden was not on Tish to request a specific accommodation.  Once Magee was aware of Tish's disability and consequent need for a reasonable accommodation, the burden was on Magee to request additional information for the purpose of determining whether Tish's disability could have been reasonably accommodated.  *Armstrong v. Burdette Tomlin Memorial Hospital*, 438 F.3d 240, 246-248 (3d Cir. 2006).[15]  The

---

[15] *Armstrong v. Burdette Tomlin Memorial Hospital*, 438 F.3d 240 (3d Cir. 2006), concerned New Jersey's Law Against Discrimination ("LAD") rather than the ADA or the Rehabilitation Act.  Nevertheless, the LAD has been construed in accordance with the ADA.  *Armstrong*, 438 F.3d at 246, n. 12.  For this reason, the analysis in *Armstrong* provides valuable guidance as to how the ADA and the Rehabilitation Act should be construed.  *Johnson v. McGraw-Hill Companies*, 451 F.Supp.2d 681, 706 (W.D.Pa. 2006).

United States Court of Appeals for the Third Circuit has acknowledged that employers are usually in a better position than a disabled employee to determine whether the employee's disability can be accommodated. In *Taylor v. Phoenixville School District*, 184 F.3d 296 (3d Cir. 1999), the Court of Appeals explained:

> The interactive process would have little meaning if it was interpreted to allow employers, in the face of a request for accommodation, simply to sit back passively, offer nothing, and then, in post-termination litigation, try to knock down every specific accommodation as too burdensome. That's not the proactive process intended: it does not help avoid litigation by bringing parties to a negotiated settlement, and it unfairly exploits the employee's comparative lack of information about what accommodations the employer might allow. In addition, in some cases courts may be better positioned to judge whether the employer met with the employee in good faith than to judge how burdensome a particular accommodation really is.

*Taylor*, 184 F.3d at 315-316 (footnote omitted). Delserone's affidavit does not entitle Magee to summary judgment, since the onus was not on Tish to discover a particular accommodation for her alleged disability.

The evidence of record, when viewed in the light most favorable to Tish, could establish that Magee utterly failed to engage in the interactive process.[16] According to Tish, Novak simply told her that no part-time positions were available and instructed her to seek unemployment compensation benefits. Doc. No. 37-2, pp. 4-5, ¶ 14. The inquiry, of course, does not end there. In order to hold Magee liable for a breakdown in the interactive process, Tish must establish that she could have been reasonably accommodated had Magee acted in good faith. Since Tish proceeds in accordance with a failure-to-transfer theory, she must show that: (1) Magee had a vacant, funded position; (2) the position was at or below the level of the medical assistant

---

[16]Magee apparently believes that it satisfied its duty to engage in the interactive process when Hayes allegedly told Tish that the duties of an obstetrical/gynecological medical assistant could not be performed from a sedentary position. Doc. No. 32-2, p. 28, ¶¶ 10-11. An employer's duty to engage in the interactive process, however, requires the employer to do more than simply answer the specific questions posed by a disabled employee. "The interactive process, as its name implies, requires the employer to take some initiative." *Taylor v. Phoenixville School District*, 184 F.3d 296, 315 (3d Cir. 1999). As the United States Court of Appeals for the Third Circuit stated in *Mengine v. Runyon*, 114 F.3d 415, 420-421 (3d Cir. 1997), "if an employer fails to engage in the interactive process, it may not discover a way in which the employee's disability could have been reasonably accommodated, thereby risking violation of the Rehabilitation Act."

position that Tish held immediately before the skiing accident; and (3) Tish was qualified to perform the essential duties of the vacant position with a reasonable accommodation. *Donahue v. Consolidated Rail Corporation*, 224 F.3d 226, 230 (3d Cir. 2000). In order to surmount this hurdle, Tish references five vacant positions that she was both qualified for and physically capable of holding. Doc. No. 37-2, pp. 6-7, ¶ 20. She also points to the job descriptions for each of these positions in order to show that she was qualified for them. Doc. No. 37-6, pp. 5-9.

Tish apparently believes that she could have worked in a full-time, sedentary job or in a part-time, non-sedentary job. She identifies five vacant jobs that she could have been offered. One was a flexible, full-time medical secretary position requiring rotation among obstetrical/gynecological clinics in Oakmont, Pleasant Hills and Oakland, Pennsylvania. Doc. No. 37-2, p. 7; Doc. No. 37-6, p. 5. Another job identified by Tish was a part-time phlebotomist position, which would have required Tish to work only sixteen hours per week. Doc. No. 37-2, p. 7; Doc. No. 37-6, p. 6. Tish had apparently worked as a phlebotomist before, making her qualified for the part-time position. A third vacancy identified by Tish was a casual medical assistant position at an obstetrical/gynecological clinic located in Bethel Park, Pennsylvania. Doc. No. 37-2, p. 7; Doc. No. 37-6, p. 7. Tish contends that she was also capable of serving as a medical secretary at a pathology clinic. Doc. No. 37-2, p. 7; Doc. No. 37-6, p. 8. Finally, Tish argues that she could have served as a part-time birth register. Doc. No. 37-2, p. 7; Doc. No. 37-6, p. 9. All of these vacancies were posted, at one time or another, between January 2004 and June 2006.[17] Doc. No. 37-2, p. 6, ¶ 20.

As noted earlier, both "part-time or modified work schedules" and "reassignment to a vacant position" are listed as "reasonable accommodations" under the ADA. 42 U.S.C. § 12111(9). A failure on the part of a covered employer to make a reasonable accommodation for a disabled employee constitutes unlawful "discrimination" within the meaning of the ADA. 42 U.S.C. § 12112(b)(5). These same standards apply to claims under the Rehabilitation Act. 29 U.S.C. § 794(d). By identifying five vacant jobs to which she could have been transferred, Tish

---

[17]In considering reassignment to a vacant position for a disabled employee, a covered employer must consider not only those positions immediately available at the time of the requested accommodation, but also those which will become available within a reasonable period of time. *Dark v. Curry County*, 451 F.3d 1078, 1089-1090 (9th Cir. 2006).

has created a genuine issue of material fact as to whether she could have been accommodated had Magee made a good faith effort to engage in a meaningful interactive process. Consequently, a genuine issue of material fact exists as to whether Magee "discriminated" against Tish within the meaning of the Rehabilitation Act.

Tish's apparent failure to formally apply for the five vacant positions in question is not fatal to her claims. Relying on the Supreme Court's decision in *US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002), the United States Court of Appeals for the Third Circuit made the following observations in *Shapiro v. Township of Lakewood*, 292 F.3d 356 (3d Cir. 2002):

> It therefore appears that the Court has prescribed the following two-step approach for cases in which a requested accommodation in the form of a job reassignment is claimed to violate a disability-neutral rule of the employer. The first step requires the employee to show that the accommodation is a type that is reasonable in the run of cases. The second step varies depending on the outcome of the first step. If the accommodation is shown to be a type of accommodation that is reasonable in the run of cases, the burden shifts to the employer to show that granting the accommodation would impose an undue hardship under the particular circumstances of the case. On the other hand, if the accommodation is not shown to be a type of accommodation that is reasonable in the run of cases, the employee can still prevail by showing that special circumstances warrant a finding that the accommodation is reasonable under the particular circumstances of the case.

*Shapiro*, 292 F.3d at 361. Magee has not clearly articulated a "disability-neutral rule" that precluded it from considering Tish for the five positions identified by her. Nevertheless, the Court is of the view that Magee's apparent practice of requiring its employees to apply for vacant positions on their own qualifies as such. In *Shapiro*, the disability-neutral rule at issue was an "unwritten practice" under which vacancies for positions were posted on a bulletin board, and employees desiring transfers were expected to apply for the positions that they desired. *Id.* at 360. As far as the Court can tell, Tish's proposed accommodation (i.e., a transfer to a vacant position) appears to be reasonable in "the run of cases."[18] *Id.* In any event, the "reasonableness" of a proposed accommodation is a question of fact. *Williams*, 380 F.3d at 771. For the purpose

---

[18]Magee does not make an extensive argument concerning this issue. In its reply brief, Magee argues that Tish has failed to provide evidence of her qualifications for the five vacant positions. Doc. No. 38, p. 4. Having reviewed the job postings, however, the Court observes that Tish's experience as a medical assistant and as a phlebotomist would likely qualify her for those positions.

of the instant motion for summary judgment, Tish has shifted the burden to Magee.

A defendant such as Magee can defeat a claim under the ADA or the Rehabilitation Act by establishing, as a matter of law, that the proposed accommodation would impose an "undue hardship" on the operation of its business.[19] *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 614-615 (3d Cir. 2006). At this point, Magee makes no argument concerning the impact that Tish's proposed accommodation would have had on its business operations. Therefore, the Court has no occasion to consider whether Magee would have been entitled to summary judgment had it pursued the "undue hardship" issue at this stage. Based on the current state of the record, the Court cannot say that Magee is entitled to a judgment as a matter of law.

## Conclusion

Because genuine issues of material fact exist as to whether Tish was "disabled" within the meaning of the Rehabilitation Act when her employment was terminated, whether Magee fulfilled its duty to engage in the interactive process, and whether Tish could have been reasonably accommodated under the circumstances of this case, the Court will deny Magee's motion for summary judgment. As the case progresses, Tish may argue that Magee "regarded" her as disabled even if it is ultimately determined that she was not actually disabled, and Magee will be free to argue that Tish's proposed accommodation would have imposed an "undue hardship" on its operations. The Court's denial of the pending motion for summary judgment does not foreclose any avenue of adjudication in this case. The factual issues surrounding the

---

[19]The "undue hardship" standard is based on 42 U.S.C. § 12112(b)(5)(A), which defines the term "discrimination" to include a covered entity's "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." The ADA defines the term "undue hardship" as "an action requiring significant difficulty or expense," when considered in light of the following factors: "(i) the nature and cost of the accommodation needed under [the ADA]; (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility; (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and (iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity." 42 U.S.C. § 12111(10)(A)-(B).

termination of Tish's employment with Magee should be decided by a jury when the record is more fully developed at trial. *Turner*, 440 F.3d at 615. The record in this case includes some affidavits, but no deposition testimony has been presented. Given the current state of the record, this case is simply not amenable to resolution at the summary judgment stage.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **VALENTINA V. TISH,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **2:06-cv-820** |
| ) | |
| **MAGEE-WOMEN'S HOSPITAL OF** ) | |
| **THE UNIVERSITY OF PITTSBURGH** ) | |
| **MEDICAL CENTER,** ) | |
| ) | |
| **Defendant.** ) | |

## ORDER OF COURT

AND NOW, this 27th day of October, 2008, in accordance with the foregoing memorandum opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that the Defendant's Motion for Summary Judgment (*Document No. 29*) is **DENIED**.

Plaintiff shall file her Pretrial Narrative Statement on or before **November 17, 2008**. Defendant shall file its Pretrial Narrative Statement on or before **December 8, 2008**. A Pretrial Conference is scheduled on **Friday, December 12, 2008 at 2:15 P.M.** in Courtroom 6C, 6th Floor, U.S. Courthouse, 700 Grant Street, Pittsburgh, Pennsylvania 15219.

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge

cc:     Gregory G. Paul, Esquire
        Email: gpaul@peircelaw.com

        Pamela G. Cochenour, Esquire
        Email: pgc@pbandg.com
        William Pietragallo, II, Esquire
        Email: wp@pbandg.com